SCOTT K. WILSON, Federal Public Defender (#13967)
EMILY A. STIRBA, Assistant Federal Public Defender (#17112)
FEDERAL PUBLIC DEFENDER
DISTRICT OF UTAH
46 West Broadway, Suite 110
Salt Lake City, Utah 84101
Telephone: (801) 524-4010
Email: emily_stirba@fd.org

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PAMELA DIAZ-OSUNA,<br><br>Defendant. | **DEFENSE'S MOTION TO REOPEN DETENTION HEARING AND RECONSIDER ORDER OF DETENTION, OR ALTERNATIVELY, FOR TEMPORARY RELEASE**<br><br>Case No. 2:19-cr-00226-HCN<br><br>Magistrate Judge Jared Bennett[1] |

Pamela Diaz-Osuna, through undersigned counsel and pursuant to 18 U.S.C. § 3142(f), respectfully asks this Court to reopen her detention hearing and reconsider her order of detention due to the prolonged delay of her trial date and the threat to her health due to the coronavirus pandemic. Alternatively, Ms. Diaz-Osuna moves this Court for immediate temporary release from custody under 18 U.S.C. § 3142(i). Ms. Diaz-Osuna requests a hearing on this motion.

In support of this motion, counsel states the following on information and belief:

1) On June 17, 2020, Ms. Diaz-Osuna and her co-defendant, Edgar Daniel Carillo, were presented on a complaint alleging conspiracy to distribute methamphetamine. Magistrate Judge Paul M. Warner ordered Ms. Diaz-Osuna detained pending her next hearing.

[1] Magistrate Judge Paul M. Warner issued the first order of detention in this case in June 2019. Judge Warner has since retired. The case has been reassigned to Magistrate Judge Jared C. Bennett (Dkt. 43).

2) On June 26, 2019, a grand jury returned an indictment against Ms. Diaz-Osuna charging her with one count of Possession with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c) (Dkt. 14).

3) On June 27, 2019, Ms. Diaz-Osuna was arraigned on the indictment. Judge Warner heard arguments on the issue of detention and ordered Ms. Diaz-Osuna detained pending trial.

4) Circumstances in the United States have radically changed since Ms. Diaz-Osuna was first detained in June 2019. The coronavirus, or COVID-19, has emerged as a global and national health emergency. On March 11, 2020, the World Health Organization declared COVID-19 to be a global pandemic. Citing "deep[] concern[] both by the alarming levels of spread and severity, and by the alarming levels of inaction," the WHO called for countries to take "urgent and aggressive action."[2] On March 13, 2020, President Donald Trump declared a national emergency.

5) In response to the pandemic, on March 16, 2020, Chief Judge Robert J. Shelby entered a General Order suspending jury selection and jury trials scheduled to begin before May 1, 2020.[3] The Court has since issued a series of orders successively continuing all jury trials, most recently through February 1, 2021.

6) Ms. Diaz-Osuna has remained detained during this delay, enduring the stress of the repeated delays of her trial date and the uncertainty of when the courthouse will be able to resume jury trials.

---

[2] "Coronavirus: COVID-19 Is Now Officially A Pandemic, WHO Says," NPR March 11, 2020, available at: https://www.npr.org/sections/goatsandsoda/2020/03/11/814474930/coronavirus-covid-19-is-now-officially-a-pandemic-who-says

[3] D. Ut. General Order No. 20-009, In the Matter of Court Proceedings and Court Operations during the Coronavirus (COVID-19) Pandemic.

7) Ms. Diaz-Osuna's continued incarceration further poses a grave danger to her health and safety. The destructive wake of coronavirus has been nothing short of stunning. As of November 18, 2020, over 55 million people have been diagnosed with coronavirus world-wide, and over 1.3 million people have died as a result.[4] In the United States, over 11.1 million people have been diagnosed, with 246,232 deaths.[5]

8) As a detainee, Ms. Diaz-Osuna could not be in a worse position to protect herself from COVID-19. Public health officials have warned for months that jails and prisons are extremely high-risk breeding grounds for coronavirus. Emerging studies regarding COVID-19 indicate that the spread of the virus is mostly via respiratory droplets among close contacts and through contact with contaminated surfaces or objects. Detention facilities, which confine people in close proximity with shared ventilation and communal dining, bathing and sleeping areas, are particularly ill-equipped to prevent the virus's transmission. "COVID-19 poses a serious risk to inmates and workers in detention facilities." Declaration of Chris Beyrer, M.D., MPH, Professor of Epidemiology, Johns Hopkins University ¶ 11 (Attachment A). It is well-known that such facilities are "associated with high transmission probabilities for infectious diseases." *Id.*; *see also id.* at ¶ 13 (social distancing and decontaminating surfaces in detention facilities is "virtually impossible"); Affidavit of Brie Williams, M.D., Professor of Medicine, University of California, San Francisco ¶ 7 ("Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons.") (Attachment B); Affidavit of Eddie Stenehjem, M.D., Infectious Diseases

[4] WHO Coronavirus Disease (COVID-19) Dashboard, *available at* https://covid19.who.int/ (last accessed November 18, 2020).

[5] CDC COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last accessed November 18, 2020).

Physician for Intermountain Healthcare ¶ 7 ("Jails and prisons in Utah are at a very high risk for being a focal point of SARS COV-2 transmission due to the inability for prisoners and prison staff to perform aggressive social distancing.") (Attachment C). The rates of infection in the Bureau of Prisons (BOP) confirm how uniquely dangerous detention facilities are in this pandemic. As of November 12, 2020, the BOP has an infection rate that is 4.52 times higher than that of the general population of the United States, 54.18 times that of Italy, and 2333.74 times that of China.[6]




9) The state of Utah is in the midst of a sobering coronavirus surge. As of November 8, 2020, the Utah Department of Health reported 132,621 total cases of COVID-19 and 6,084 COVID-19-related hospitalizations.[7] In the seven-day period between November 9 through November 16, Utah has totaled 21,187 new cases of the coronavirus, including two days when new cases surpassed 4,000.[8] The dramatic increase in new cases has led

[6] *See* Attachment D for underlying data.

[7] Executive Order 2020-72, Declaring a State of Emergency Due to Rising COVID-19 Case Counts Creating a Shortage of Hospital Beds, available at https://governor.utah.gov/wp-content/uploads/sites/40/2020/11/EO-2020-72.state-of-emergency-covid-19.pdf

[8] "Coronavirus in Utah: Record-breaking week ends with a total of more than 21,000 cases," by Alex Vejar. Salt Lake Tribune, November 15, 2020, available at https://www.sltrib.com/news/2020/11/15/coronavirus-utah-record/ (last accessed November 18, 2020).

to a similar increase in hospitalizations, with 85% of Utah's ICU capacity in use.[9]




10) In light of this strain on the health care system, Utah Governor Gary Herbert declared a state of emergency on November 8, 2020. In his executive order, Governor Herbert stated that current rates of increase in COVID-19 cases and hospitalizations may soon create needs that overwhelm ICUs and may lead to "degraded care and increased mortality for both COVID-19 and non-COVID-19 patients."[10]

## ARGUMENT

Ms. Diaz-Osuna respectfully requests pretrial release on two grounds. First, in light of the changed circumstances of the coronavirus pandemic, Ms. Diaz-Osuna seeks release under 18 U.S.C. § 3142 because she has rebutted the presumption and the Court can impose conditions of release. Second, even if the Court determines that Ms. Diaz-Osuna has not rebutted the presumption, she seeks release under 18 U.S.C. § 3142(i), which allows for the "temporary release" of a person in custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." *Id.*

### A. The Court should reopen the detention hearing and release Ms. Diaz-Osuna.

[9] Utah Executive Order 2020-72.
[10] *Id.*

First, the defense asks the Court to reconsider Ms. Diaz-Osuna's detention under 18 U.S.C. § 3142(f) in light of the novel coronavirus pandemic, a global public health threat that has developed since her detention hearing 17 months ago. This pandemic qualifies as a changed circumstance for two reasons. First, the pandemic has led to a prolonged delay of Ms. Diaz-Osuna's trial date, with no guarantee that the courthouse actually will be able to resume jury trials as of the current projected date of February 1, 2021. Second, especially given the surging rates of coronavirus throughout the country and in Utah, Ms. Diaz-Osuna is at a heightened risk for infection of a novel and deadly virus if she remains detained. In light of these new circumstances, the Court should reopen the detention hearing and release Ms. Diaz-Osuna.

*1) Very little is required to rebut the presumption of detention under section 3142(e)(3).*

Although a rebuttable presumption of detention does apply in this case, 18 U.S.C. § 3142I(3)(A) and (B), federal courts have made clear that very little is required for a defendant to rebut the presumption of detention. A defendant simply needs to produce "some evidence that he will not flee or endanger the community if released." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986); *see also United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985) (holding that a defendant only has a burden of production and only needs to produce "some evidence" to rebut the presumption); *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985) (stating that a defendant has a burden of production and only needs "to offer some credible evidence contrary to the statutory presumption"). This "burden of production is not a heavy one." *Dominguez*, 783 F.2d at 707. Indeed, the presumption of detention is rebutted by "*[a]ny evidence* favorable to a defendant that comes within a category listed in § 3142(g) . . . including evidence of their marital, family and employment status, ties to and role in the community . . . and other types of evidence encompassed in § 3142(g)(2)." *Id.* (emphasis added). Any "evidence of economic and social stability" can rebut the presumption. *Id.* As long as a defendant "come[s] forward with some

evidence" pursuant to § 3142(g), the presumption of flight risk and dangerousness is rebutted. *Id.* ("Once this burden of production is met, the presumption is 'rebutted.'") (quoting *Jessup*, 757 F.2d at 384.[11] The government bears the burden of persuasion at all times. *Id.*; *see also Jessup*, 757 F.2d at 384, and *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985) (stating that the burden of persuasion rests with the government, not the defendant).

2) *The statutory presumptions of detention should be viewed with caution because they lead to high rates of detention for low-risk defendants.*

The Court should also view the statutory presumption with a jaundiced eye, particularly in this case that involves drug and firearm offenses. Congress enacted the statutory presumptions of detention in the Bail Reform Act of 1984 (BRA) "to detain high-risk defendants who were likely to pose a significant risk of danger to the community if they were released pending trial."[12] But the presumptions of detention have not worked as intended, and federal pretrial detention rates have increased dramatically since 1984.[13] Before the BRA, *less than two percent* of federal arrestees were jailed pending trial.[14] According to the Bureau of Justice Statistics, the detention rate across the country increased from 59% in 1995 to 76% in 2010.[15] A recent study by the Administrative Office of the Courts (AO) attributed this "massive"[16] increase in detention rates to the presumptions of detention, especially as they are applied to low-risk defendants.[17] For

[11] To rebut the presumption of flight risk, for example, a defendant does not "have to prove that he would not flee—i.e., he would [not] have to persuade the judicial officer on the point. [Instead], he would only have to introduce a certain amount of evidence contrary to the presumed fact." *Jessup*, 757 F.2d at 380–81; *accord Dominguez*, 783 F.2d at 707.

[12] Amaryllis Austin, The Presumption for Detention Statute's Relationship to Release Rates, 81 FEDERAL PROBATION 52, 56–57 (2017), archived at https://perma.cc/9HGU-MN2B.

[13] *Id*. at 53.

[14] U.S. Department of Justice, Bureau of Justice Statistics, Pretrial Release and Detention: The Bail Reform Act of 1984 Table 1 (1988), archived at https://perma.cc/CS86-NJA8 (showing 1.7% of federal arrestees were detained pretrial in 1983).

[15] Austin, supra note 1, at 53 (citing U.S. Department of Justice Bureau of Justice Statistics, Pretrial Detention and Misconduct in Federal District Courts, 1995–2010 1 (2013), archived at https://perma.cc/U2V5-GYYP).

[16] *Id*. at 61.

[17] *Id*. at 57

example, the statutory presumptions in drug and firearm cases applied to *nearly half* of all federal cases each year.[18] If not for the presumptions of detention, low-risk defendants "might be released at higher rates."[19] Instead, the presumptions of detention have become "an almost de facto detention order in almost half of federal cases."[20]

Relying on the groundbreaking findings of the AO study, the Judicial Conference's Committee on Criminal Law recently determined "that the § 3142I presumption was unnecessarily increasing detention rates for low-risk defendants, particularly in drug trafficking cases."[21] To address this problem, the Judicial Conference proposed significant legislative reform that would amend the presumption of detention in drug cases "to limit its application to defendants described therein whose criminal history suggests that they are at a higher risk of failing to appear or posing a danger to the community."[22] While the Judicial Conference's proposed legislation has not been enacted yet, this Court can certainly take it into account when evaluating the presumption of detention in this case.

*3) Ms. Diaz-Osuna is able to rebut the presumption and the Court should release her with conditions.*

The Supreme Court has made clear that "[i]n our society, liberty is the norm, and detention prior to trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Ms. Diaz-Osuna does not fall into this narrow category, especially as the coronavirus pandemic rages on in Utah and poses a significant threat to her health if she remains detained. She is able to rebut the presumption of detention. Ms. Diaz-Osuna has lived in Utah since 2010 and is a legal permanent resident of this country. She has a verified residence and a job waiting for her in the

---

[18] *Id*. at 55 (the drug presumption "applied to between 42 and 45 percent of [all federal] cases every year").
[19] *Id*. at 57.
[20] *Id*. at 61.
[21] Report of the Proceedings of the Judicial Conference of the United States 10 (September 12, 2017), archived at https://perma.cc/B7RG-5J78.
[22] *Id*.

community. Ms. Diaz-Osuna has an extremely minimal criminal history consisting merely of traffic offenses, a successful misdemeanor plea-in-abeyance from 2015, and a pending misdemeanor criminal mischief/destruction of property charge.

In light of Ms. Diaz-Osuna's minimal criminal history, long-time residence in Utah, verified address in the community, and outstanding offer of employment, the Court *can* impose conditions of release that will reasonably assure community safety and her future appearance as required. Specifically, the defense would request the strictest set of supervision available to the Court, including home confinement, location monitoring, a prohibition against any firearms or dangerous weapons, drug testing, and regular contact with a pretrial supervision officer.

**B) Alternatively, the Court should temporarily release Ms. Diaz-Osuna due to her increased risk from the coronavirus and her restricted access to counsel.**

Alternatively, even if the Court determines that Ms. Diaz-Osuna cannot be released based on the 3142(g) factors, the Court should temporarily release Ms. Diaz-Osuna pursuant to 18 U.S.C. § 3142(i). Under that section, a Court may issue a "subsequent order" temporarily releasing an individual in custody "to the extent that the judicial officer determines such release to be necessary for the preparation of the person's defense or for another compelling reason." *Id.*

Ms. Diaz-Osuna should be released under subsection (i) for two reasons. First, the fact that Ms. Diaz-Osuna faces a heightened risk of infection of a novel and potentially deadly virus because of her detention constitutes a "compelling reason" for her temporary release. Second, the pandemic-related jail restrictions are impeding preparation of her defense. Since the outbreak, defense counsel has had only compromised access to Ms. Diaz-Osuna. It is not practical or safe for defense counsel to visit Ms. Diaz-Osuna in person. Undersigned counsel requires a Spanish translator, and the non-contact visiting rooms at the Davis County jail are small and enclosed. Neither defense counsel nor a translator should be expected to endure the health risks of prolonged

close contact with each other simply to provide Ms. Diaz-Osuna the effective legal representation to which she is constitutionally entitled. Although video visits are available at the Davis County Jail, the video equipment is stationed inside Ms. Diaz-Osuna's unit, where other detainees can see and overhear her side of conversations with counsel. Defense counsel simply cannot have full and confidential conversations with Ms. Diaz-Osuna under such circumstances, which impedes counsel's ability to assist Ms. Diaz-Osuna in preparing her defense at trial. Because of this serious impediment to communication – which, given the Utah coronavirus numbers, is unlikely to improve in the near future – this Court should order Ms. Diaz-Osuna's release on strict conditions.

## Conclusion

For the foregoing reasons, Ms. Diaz-Osuna respectfully requests that the Court reopen her detention hearing and reconsider her order of detention, or alternatively permit her temporary release.

DATED this 19th day of November, 2020.

/s/ *Emily Stirba*
Emily Stirba
Assistant Federal Public Defender