JOHN W. HUBER, United States Attorney (#7226)
STEWART M. YOUNG, Assistant United States Attorney (#14377)
STEPHEN L. NELSON, Assistant United States Attorney (#9547)
THADDEUS J. MAY, Assistant United States Attorney (#11317)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>PAMELA DIAZ-OSUNA,<br><br>Defendant. | Case No 2:19-CR-226<br><br>RESPONSE TO DEFENSE MOTION TO REOPEN DETENTION HEARING AND RECONSIDER ORDER OF DETENTION, OR ALTERNATIVELY, FOR TEMPORARY RELEASE<br><br>Magistrate Judge Jared C. Bennett |

The United States, through the undersigned Assistant United States Attorney, hereby opposes Defense Motion to Reopen Detention Hearing and Reconsider Order of Detention, Or Alternatively, for Temporary Release ("Defendant's Motion"). The defendant brings her motion pursuant to 18 U.S.C. § 3142(f) or, in the alternative, 18 U.S.C. § 3142(i). The defendant's claim is essentially that COVID-19 is a changed circumstance meriting the defendant's release. *See* 18 U.S.C. § 3142(f)(2) ("The hearing may be reopened . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."); and 18 U.S.C. § 3142(i)(4) ("The judicial officer may . . . permit the temporary release of the person . . . to the extent that the judicial officer determines such

release to be necessary for the preparation of the person's defense or for another compelling reason").

The defendant also argues that it is difficult to prepare for her defense because of limits on legal visitation and argues that confinement is an ideal environment for this disease. Numerous courts have recently denied similar claims. *See e.g.*, *United States v. Holt,* 2:19-cr-413-CW, minute entry at ECF No. 22 (D. Utah Mar. 22, 2020) (district judge upholds detention order and notes because of "[t]he current COVID-19 pandemic, pretrial is not able to adequately supervise the defendant."); *United States v. Shepherd*, 2:20-cr-114-JNP, Doc. 42 (D. Utah Apr. 2, 2020) (Magistrate Judge Pead finding COVID-19 pandemic a compelling reason to review detention but denying release because of defendant's danger to the community and his "too speculative" concerns about COVID-19 and his failure to establish inability to prepare for his defense); *United States v. Mott*, 4:19-cr-128-DN, Doc. 146 (D. Utah Apr. 2, 2020) (Magistrate Judge Kohler finding COVID-19 pandemic a compelling reason to review detention but denying release because of defendant's danger to the community and his "too speculative" concerns about COVID-19); *United States v. Jacques,* 4:19-cr-63-DN, Doc. 30 (D. Utah Mar. 30, 2020) (Magistrate Judge Romero finding COVID-19 pandemic a compelling reason to review detention but denying release because of defendant's danger to the community, U.S. Probation's curtailed ability to supervise defendant, and "speculative" concerns about COVID-19); *United States v. Jones*, No. 1:17-CR-00582 – CCB-2, 2020 WL 1323109, at *1 (D. Md. Mar. 20, 2020) (recognizing the serious health risk of COVID-19 and underlying health conditions of the defendant but ordering defendant's continued detention under the 3142(g) factors notwithstanding).[1] *But see United States v. Stephens,* No. 15-CR-95 (AJN), --- F. Supp. 3d ---,

---

1 *See also*, *United States v. Hamilton,* NO. 19-CR-54-01 (NGG), 2020 WL 1323036, at *2

2020 WL 1295155, at *1 (S.D.N.Y. Mar. 19, 2020) (finding that COVID-19 was a "compelling reason" for release under § 3142(i) but releasing defendant due to new evidence that belied that defendant was a danger to the community).

Because the defendant has failed to make a sufficient factual showing for the relief sought, this Court should follow the majority of courts to date and deny her Motion.

Because of the nature of the charges against the defendant, there also is a presumption that no condition or combination of release conditions will assure the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A). This presumption triggers a burden that the defendant must offer some credible evidence to rebut the statutory presumption. *See U.S. v. Taylor, 289 F.Supp.3d 55, 62 (D.D.C. 2018).* Because the Court's original decision on detention remains a sound one, the defendant's continued decision is warranted. This Court should deny her Motion.

**PROCEDURAL BACKGROUND**

The defendant was arrested on a Complaint on June 13th, 2019, and indicted by the grand jury on June 26th, 2019. *See* Doc. Nos. 13 and 14. On June 27th, 2019, U.S. Magistrate Judge Paul Kohler ordered the defendant detained finding the defendant both a danger to the community as well as a threat of non-appearance. *See* Doc. No. 18. The defendant now asks the

---

(E.D.N.Y. Mar. 20, 2020) (finding COVID-19 pandemic insufficient reason to justify release under the circumstances of the case); *United States v. Gileno*, No. 3:19-CR-161-(VAB)-1, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020) (defendant has not shown that the COVID-19 plan proposed by the BOP is inadequate to manage the pandemic within defendant's correctional facility or that the facility is unable to adequately treat the defendant); *United States v. Martin*, No. CR PWG-19-140-13, 2020 WL 1274857, at *3 (D. Md. Mar. 17, 2020) (noting that as concerning as the COVID-19 pandemic is, resolving an appeal of detention must be an individualized assessment of the factors required by the Bail Reform Act, and finding the defendant's underlying health conditions insufficient to rebut the proffer by the United States regarding precautionary and monitoring practices sufficient to protect detainees from exposure to the virus).

Court to re-consider this decision, in large part, because of the COVID-19 pandemic. *See* Doc. No. 53.

## ARGUMENT

The defendant relies on the speculative prospect of a COVID-19 outbreak at the Davis County Jail, the pretrial facility where she currently is housed and her inability to prepare for a defense. The criminal justice system's response to COVID-19 cannot simply be to release prisoners who are a danger to the community or a risk of flight. Doing so would put the public at serious danger and shift the burden of supervision from the jail facility to the already taxed U.S. Pretrial Services Offices. Moreover, the U.S. Marshals Service and its local contractual partners have taken, and continue to take, precautionary measures to prevent transmission of COVID-19. Finally, the Bail Reform Act requires courts to conduct an individualized determination of the § 3142 factors. In this case, such analysis demands continued detention.

### I. Releasing the Defendant and Others Similarly Situated Would Place an Undue Danger on the Community and an Unmanageable Burden on Pretrial Services.

The United States appreciates the defendant's concerns about COVID-19. This is an unprecedented crisis that is also resulting in great anxiety for people outside of jail. The United States may be more receptive to some defendants' motions for release if the traditional supervision by U.S. Pretrial Services were in place. However, U.S. Probation's ability to supervise defendants in the community during the COVID-19 pandemic is (understandably) greatly curtailed.

It is the United States' understanding that Pretrial Service Officers currently are unable to participate in field work. Home visits are not being conducted. Instead, Pretrial Service Officers are relegated to far less effective video-telephonic products such as FaceTime. Additionally, pretrial defendants are unable to meet with their Pretrial Services Officer at the Probation Office.

This means Pretrial Services is unable to provide in-person contacts with supervised defendants. Without face-to-face interactions, the Pretrial Service Officers are unable to monitor defendants effectively.

Additionally, while vendors are still conducting drug testing, defendants need only claim illness, knowing they will be excused from this testing. Moreover, for defendants in need of recovery support, neither drug and alcohol nor mental health group meetings are being held. Additionally, community group recovery meetings are not being held during this crisis.[2] While Pretrial Services Officers may be using FaceTime, or other technological means of checking in with pretrial defendants, these tools are an ineffective substitute for in person contacts and are inadequate to accurately determine whether defendants are complying with their terms of pretrial release.

Also, before a defendant is placed on release, a Pretrial Services Officer usually must vet the proposed residence and meet the proposed third-party custodian and other residents who live there. A flood of release orders would force these Pretrial Service Officers to place released individuals in unvetted residences, without the usual in-person transition supports and without the many pretrial and community resources typically available. To be clear, Pretrial Services is currently unable to perform its core function of home visits.[3]

---

[2] Utah Support Advocates for Recovery Awareness ("USARA") notes that effective 3/16/2020 "USARA Recovery Community Centers statewide will be closed and there will not be any group recovery meetings held or any individual recovery coaching appointment until after April 1st, pending further public health official notices." https://www.myusara.com.

[3] The United States Attorney's Office understands why these in-person and in-home meetings should not occur. Such meetings would expose all parties to a heightened risk of infection, and its subsequent risk of spreading such infection. But these limitations underscore the reasons that the defendant should remain incarcerated during this time. The defendant simply will not be afforded adequate supervision as the "combination of conditions" typically available by Pretrial Services are not currently available.

The speculative prospect of a COVID-19 outbreak at the Davis County Jail does not diminish the public interest in keeping the defendant off the streets based on the existing judicial finding of dangerousness that cannot be ameliorated by any combination of release conditions. Because our entire community infrastructure is compromised during this pandemic, courts arguably should detain more dangerous defendants pretrial, not fewer, as Pretrial Services does not have the usual combination of conditions to reasonably assure the safety of the community during this pandemic. If the Court did release the defendant, and other defendants, such release would not only endanger the community, it would quickly stretch the bandwidth of existing Pretrial Services beyond its breaking point.

To be sure, one case by itself would not strain the system. But if the Court released the defendant, then undoubtedly an avalanche of defendants would also seek release. Each defendant would make the generic argument, now being made by the defendant, for release to reduce contact with other persons who are detained—notwithstanding that the Court ordered detention to protect the community *from the defendant* and because of the defendant's serious risk of flight. *See* Doc. No. 18 (Judge Kohler's original order of detention); *See, e.g., United States v. Holt*, 2:19-cr-413-CW, minute entry at ECF No. 22.

The United States is greatly concerned about the defendant being released without adequate supervision. Awarding relief here, and in similar cases, would place a substantial and unwarranted burden on Pretrial Services. Pretrial Services has a finite number of resources available and a finite number of employees to supervise pretrial defendants. They have a limited number of electronic monitoring devices and resources to monitor these devices. Pretrial Service Officers typically rely on in-person contacts to conduct their work, an area already disrupted during this pandemic.

### II. The Local Jails Have Established Procedures to Avoid a Widespread COVID-19 Outbreak.

The Bail Reform Act instructs courts to consider the "physical and mental condition" of the defendant as one of the factors in its analysis. 18 U.S.C. § 3142(g)(3)(A). Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of the defendant's release.

The local jails have implemented substantial precautionary measures to mitigate this risk of infection. For instance, all the detention facilities utilized by the U.S. Marshals Service in Utah have implemented enhanced screening based on the CDC guidelines. Contracting jails have also ceased in-person visitation. Contracting jails are refusing to accept individuals showing symptoms unless and until they are cleared by a medical professional. A number of facilities have significantly limited the number of new inmates into the facility. Some facilities are restricting movement of inmates between pods. Additionally, all state and federal court hearings are being held remotely so inmates are not being transported to and from courthouses.

Despite all of the precautionary measures being implemented in our jails and in our communities, we are all at risk of infection. The defendant does not allege that she has COVID-19 or even that she has been exposed to any individuals with COVID-19. In this way, she is not seeking release based on her *actual* "physical and mental condition." Instead she relies solely on the *possibility* of becoming infected. To be clear, a detainee's possibility of becoming infected is exacerbated during this pandemic, whether incarcerated or out on release. Even if she is released, she faces the danger of being infected by this virus.

The defendant also argues that she will be unable to prepare for her defense while incarcerated because some jails are limiting in-person contacts between those in jail and their attorneys. Because criminal cases area already being continued under the Court's General Order

20-010, Judge Warner recently determined that suspending visits with attorneys will not impact a detained defendant's ability to prepare his defense. *See, e.g.*, *United States v. Bowens*, 1:20-cr-00003, ECF No. 17. (D. Utah April 3, 2020) ("Defendant should still be able to prepare for his defense through access to discovery, as well as through telephone, mail, and e-mail communications with his counsel. Moreover, all criminal cases have been continued pursuant to General Order 20-010. Thus, there will be time for in-person visits at the jail when that option becomes available.")

As noted, detainees, where permitted, will still have access to discovery. In addition, defendants are being provided wide latitude in telephone communications with their attorneys, e-mail communications, and traditional mail communications as well. Finally, the U.S. Attorney's Office has taken recent measures to ensure that privileged communications between the defendant and her counsel remain private and confidential.

**III. Individualized Analysis of the § 3142 Factors Favor Detention.**

Defendant's Motion, which focuses almost exclusively on the impact of the COVID-19 pandemic, does not adequately address the other factors a court must consider in determining whether a defendant poses a danger to the community or risk of non-appearance. These factors include: "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . a controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). The United States respectfully submits that an analysis

under these factors show that the defendant poses an unmanageable risk of nonappearance and an unmanageable risk of danger to the community.

### A. The Nature and Circumstances of the Offense

The defendant was arrested following a multi-month drug conspiracy investigation. In the time period leading up to the defendant's arrest, the FBI completed a number of controlled purchases of narcotics from the defendant, some of which are detailed in the Complaint, and intercepted pursuant to court order a number of the defendant's drug- and gun-related conversations. In one particular conversation, intercepted on May 20th, 2019, the defendant discussed the sale of firearms with an individual named Pedro.

On June 13th, 2019, the defendant was arrested in a retail parking lot in West Jordan, Utah, on a warrant issued pursuant to a Complaint. The FBI planned the time and place of the arrest to coincide with a controlled narcotics purchase from the defendant. At the appointed time, the defendant arrived at the arrest site in a Ford Explorer accompanied by one of the defendant's children, a small infant. The defendant taken into custody after exiting her vehicle with her infant and a bag of methamphetamine.

When agents conducted an inventory of the defendant's Explorer, they located multiple baggies of heroin and methamphetamine, some of which was located in the back pouch of the front passenger seat, directly in front of the infant's car seat in the vehicle's second row of seating. In an unlocked safe on the floor near the front passenger seat, agents located more baggies containing substances that appeared to be methamphetamine and heroin, a digital scale, a pistol with a magazine and two loose bullets.

Contemporaneous with the defendant's arrest, the FBI also executed a search warrant at the defendant's residence in Sandy, Utah, where the defendant was living with Edgar Carillo (the

co-defendant in this case) and three children. During their search of the residence, the FBI located approximately 4 lbs of methamphetamine and five firearms (a Diamondback Firearms Rifle, an AK-47 rifle, a Fabrinor Legutiano Hand Gun, a Reminton Arms 1911, and a Primary weapon system rifle). In a post-*Miranda* interview, the defendant admitted to being a drug trafficker and that her source of supply was based in Sinaloa, Mexico. The defendant admitted to having traveled to Los Angeles, California, to pick up methamphetamine provided to her by this Mexico-based organization. The defendant also admitted that the agents would find 4 lbs of methamphetamine during the search of her residence in Sandy, Utah, and that she was in possession of 2 lbs or methamphetamine when she was arrested in West Jordan, Utah.

These facts relating to drug trafficking and firearm possession are crucial because they impact both the defendant's danger to the community and her capacity for supervision. The combination of drug trafficking and firearms is inherently dangerous, but in the defendant's case that combination is particularly troubling given that these behaviors were occurring in the presence of children. The defendant's choice to mix drug trafficking and firearms demonstrates a disregard for the safety of her children, of others, as well as a flippant attitude towards the law. When viewing these incidences in their totality, the unsuitability for release is apparent.

**B. Weight of the Evidence**

The evidence against the defendant is very strong. Agents monitored the defendant's criminal activity with the aid of court-authorized wiretaps, controlled purchases, and physical surveillance. Much of the physical evidence against the defendant was obtained via a search warrant. Finally, after the investigation concluded, the defendant gave a detailed, post-*Miranda* confession to agents.

### C. History and Characteristics of the Person

Defendant has a limited criminal record, but she is an unmanageable safety risk in the community. Given the amounts of narcotics and firearms involved, the government infers that the defendant was selling drugs to make money, not to support any addiction on her part. Moreover, although the defendant is a legal permanent resident of the United States (according to Defendant's Motion) and has lived in Utah for some time, the defendant has significant criminal connections outside of Utah and the United States. As described above, the defendant was sourced with narcotics by a Sinaloa, Mexico, source-of-supply and had traveled at least once to Los Angeles, California, to obtain narcotics to distribute in Utah. Moreover, as someone facing a firearms charge in relation to drug trafficking, under 18 U.S.C. § 924(c), the defendant's status as a lawful permanent resident of the United States may be in jeopardy, if she is convicted (a fact that weighs against her incentive to remain in the United States, if released). Each of these issues contribute to the conclusion that the defendant is an unreasonable risk of flight and an unmanageable safety risk to the community.

### D. The Nature and Seriousness of the Danger to the Community in the Event of Defendant's Release

The defendant's criminal choices reflected in her activities at issue in the Complaint and the Indictment alone make her a serious risk to the community if released. In this case, the defendant was possessing and intending to distribute large amounts of narcotics, which she obtained from a Mexico-based source of supply all while protecting herself with firearms. Larger-scale drug trafficking efforts are inherently dangerous, which is why they trigger a presumption that no combination of release conditions will assure the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A). They are especially dangerous when the individual participating in drug trafficking are arming themselves with firearms and participates in these activities in the

presence of children. The United States has demonstrated with clear and convincing evidence the defendant is an unmanageable risk of danger to the community.

## **Conclusion**

Based on the aforementioned reasons and arguments, the Court should deny Defendant's Motion.

Dated this 2nd day of December, 2020.

JOHN W. HUBER
United States Attorney

/s/ *Stephen L. Nelson*
STEPHEN L. NELSON
Assistant United States Attorney